Argued October 31, 1977, affirmed as modified and remanded May 2, petition for rehearing denied May 31, 1978

HOLT et al, *Plaintiffs,*
*v.*
RICE et al, *Defendants.*
(Equity No. 11,788)

GERKING, *Appellant/Cross-Respondent,*
*v.*
HANZEN et al,
*Respondents/Cross-Appellants/Cross-Respondents,*

McINTYRE, *Respondent/Cross-Respondent,*
TULLIS et ux,
*Respondents/Cross-Appellants/Cross-Respondents.*
(Equity No. 19,478)
(SC No. P2500)
578 P2d 393

James M. Habberstad, The Dalles, argued the cause for appellant/cross-respondent Gerking. With him on the briefs was Dick & Dick, The Dalles.

Alex M. Byler, of Corey, Byler & Rew, Pendleton, argued the cause for respondents/cross-appellants/cross-respondents Tullis. With him on the briefs was Jeffrey M. Wallace, Pendleton.

W. Eugene Hallman, of Mautz, Hallman & Rees, Pendleton, argued the cause for respondent/cross-appellant/cross-respondent Paul Rice. With him on the briefs were Milo W. Pope, Milton-Freewater, one of the attorneys for respondents/cross-appellants/cross-respondents Hanzen and Pinkerton; and J. T. Monahan and John U. Grove, of Monahan & Grove, Milton-Freewater, for respondent/cross-appellant/cross-respondent James Kevin Rice by his guardian Joan Rice.

Roy Kilpatrick, Mt. Vernon, argued the cause for respondents/cross-appellants/cross-respondents Hanzen and Pinkerton.

No appearance for respondents/cross-respondent McIntyre.

Before Denecke, Chief Justice, and Holman, Bryson and Lent, Justices.

HOLMAN, J.

## HOLMAN, J.

This case involves two separate proceedings which have been consolidated for trial and upon appeal. The first is a statutory proceeding of long standing under ORS ch 128, which permits suits in equity to acquire court supervision of existing trusts and authorization of transactions relating to trust property. The second proceeding is for declaratory relief. Both proceedings involve the same trust and related problems.

The dispute is over the distribution of the corpus of a trust of real property devoted to farming purposes established by the will of Alex McIntyre. When the time for termination of the trust arrived, the trustees decided to convey the land to beneficiaries Paul and James Kevin Rice in undivided one-half shares and to encumber it with a mortgage in order to raise money to pay the third beneficiary, Norman McIntyre, the cash value of his one-third interest. The trustees sought and obtained court approval of their proposed distribution in the Chapter 128 proceeding.

Subsequently, Tom and Norma Tullis, who were related to Norman, and Harold Gerking, claiming to have succeeded to the interests of Norman, made appearances in the proceeding and were made parties. An order was entered authorizing Gerking to institute a complaint against all other parties to the Chapter 128 proceedings, including the Tullises. Gerking filed this complaint as a declaratory judgment proceeding, requesting that he and the Tullises be declared to be a one-third owner of the real property which was the subject of the trust. The complaint was filed both as a separate case and in the Chapter 128 proceedings. The Tullises by answer joined in Gerking's prayer for relief. Their purported interest arose from a land sale contract by which Norman McIntyre agreed to sell his interest in the land to the Tullises, and a later agreement by which the Tullises agreed to sell the same to Gerking. These challenges were unsuccessful, and the trial court ratified the prior approval of the

trustees' distribution. Gerking and the Tullises appeal, Gerking as appellant, and the Tullises as cross-appellants.

The testator died January 15, 1954, and his will established the trust for the equal benefit of three grandchildren, Paul Rice, James Rice, and Norman McIntyre. On February 9, 1969, the three beneficiaries entered into an agreement that upon termination of the trust, Norman's interest in the trust real property would be segregated so he could readily dispose of it; Norman was not interested in farming. Thereafter, on April 11, 1972, beneficiary James Rice died, leaving a son, James Kevin Rice, a minor, who, by the terms of the trust, succeeded to his father's interest. On June 13, 1974, Norman gave the Tullises the right of first refusal at a given price if he sold his land. About July 1, 1974, Norman learned that the trustees, because of the terms of the trust, contended they could distribute the trust assets in any manner they desired upon the trust's termination and that they were not bound by the terms of the agreement for the segregation of Norman's interest. Subsequently, on August 8, 1974, Norman attained the age of 35, which was the event set by the trust for its termination. On August 14, 1974, Norman notified the Tullises he would sell in conformance with his prior agreement. The Tullises responded on August 23, 1974, that they were exercising their right of purchase.

On January 24, 1975, Norman entered into a contract with the Tullises which purported to sell by legal description the land included within the trust. It was probably Norman's intention to sell only his undivided one-third interest in the real property, but the agreement purported to cover the entire interest. It did not purport to sell Norman's interest in the trust. On the same date the Tullises gave an option to Gerking to purchase an undivided one-third interest in the property described in the contract. Thereafter, on March 12, 1975, the trustees filed a petition with the court in the Chapter 128 proceedings to terminate the

[ 206 ]

trust as to the adult beneficiaries by giving Paul and James Kevin each an undivided one-half interest in the property and paying Norman his interest in the trust in cash, with James Kevin's interest remaining in trust. The Tullises and Gerking were not made parties to this proceeding. On April 2, 1975, a decree was granted approving the proposed distribution, and the next day the trustees deeded the property to Paul and James Kevin, subject to the mortgage thereon which was given for the purpose of raising the funds necessary to pay Norman his proportionate share.

It is the contention of the Tullises and Gerking that the agreement among the three beneficiaries, dated February 9, 1969, which agreement provided that upon termination of the trust Norman would receive his interest in the form of separate land, is binding upon the trustees. The Tullises and Gerking claim to have succeeded to Norman's interest in the contract by his transfer to them of his interest in the land. The authority granted to the trustees to carry out distribution is as follows:

> "Upon any division or distribution of the trust estate, to partition, allot and distribute the trust estate in undivided interest or in kind, the valuations determined by my trustees, or partly in kind or partly in cash, and to sell such property as my trustees may deem appropriate."

The trustees and other beneficiaries contend that the agreement among the three original beneficiaries is not binding upon the trustees. The Tullises and Gerking depend upon Restatement (Second) of the Law of Trusts § 347, at 199, which says:

> "If upon the termination of the trust there are several beneficiaries among whom the trust estate is to be distributed, whether the trustee is under a duty to convey the property to the beneficiaries as tenants in common, or to divide the property and distribute it in kind, or to sell it and distribute the proceeds, depends upon the terms of the trust and in the absence of such terms upon what under all the circumstances is reasonable."

[ 207 ]

Comment *o.* to Section 347 states, in part:

> "If upon the termination of the trust there are several beneficiaries among whom the trust estate is to be distributed and all of the beneficiaries consent and none of them is under an incapacity, they can compel the trustee on the termination of the trust to transfer the trust property to them in kind, even though it is provided by the terms of the trust that the property should be sold and the proceeds divided among the beneficiaries. * * *.
> "* * * * *."

It is apparent from the quoted material that, for obvious reasons, all of the beneficiaries must consent before the agreed mode of distribution becomes binding on the trustees. James Kevin Rice, a minor, who became a beneficiary subsequent to the agreement, was not a party to it. It cannot be contended that he is bound by his father's consent to the agreement because James Kevin takes his beneficial interest in the trust not by descent from his father but, rather, directly from the testator by the terms of his will. The testamentary document provided that upon the death of the father the son would become the beneficiary. There being no consent of James Kevin, the agreement is not binding upon the trustees.

The Tullises and Gerking contend, however, that to hold the agreement not binding upon Paul Rice would be inequitable, that he was bound by the rule of estoppel by contract, and that his interest in the land should be set aside to Norman. These contentions overlook the interests of James Kevin. James Kevin, who was 14 years of age at the time of trial, and his mother, who is his guardian ad litem, both testified that they wanted James Kevin to have the opportunity to farm the land with his Uncle Paul. Whether this is feasible depends upon whether the uncle has an interest in the property as well as whether there is a sufficient amount of land involved, both of which would be jeopardized by enforcing the agreement against the uncle. The trustees apparently decided to give the boy the opportunity to farm the land if he so

chose under the tutelage of his uncle, despite any agreement the uncle may have made. We conclude that the agreement is not enforceable against the uncle's interest if the price of enforcement is in derogation of the testator's intent that the trustees have the ability to do what they believe is best to protect the interest of other beneficiaries.

■ It is also contended that the trustees should be estopped from following their plan of distribution because of representations of the trustees that the title to land would rest in Norman. We reject this argument because the interests of James Kevin cannot be prejudiced by misrepresentations of the trustees.

■■ The Tullises and Gerking further contend that Norman was treated less favorably by the trustees than was Paul Rice in their distribution of the assets because Norman was given no property when the trustees knew that he had entered into a contract to sell real property and that he would be responsible on that contract if he received no property. They also contend that no trust purposes were served by the division the trustees made. The answer to these contentions is that the trustees owe a duty not only to Norman but, as previously pointed out, to James Kevin as well. The instant contention is subject to the same basic weakness as other of appellants' contentions, *i.e.*, the trustees owed a duty to protect the interest of James Kevin who was still a minor and who did not participate in and whose interest was not bound by the pre-distribution jockeying for position and advantage. Norman did not want to be a farmer. The trustees chose to keep James Kevin's option to be a farmer open until he reaches the age when he can choose what he wishes to do. This is in conformance with trust purposes. While there was no mention of it in the trust instrument, one of the trustees, who had known and transacted legal business for the testator for many years, testified that the testator was interested in having the land stay in the family. This has a ring of truth as being the likely desire of a man who

had spent a lifetime in the accumulation of farming land. In any event, keeping the property in the family is a legitimate matter to be taken into consideration by the trustees in determining distribution.

The Tullises and Gerking further contend that the title to the real property automatically vested in Norman upon his 35th birthday since it was upon that date that the trust was terminated. They argue that, as a result, Norman had the authority to sell his undivided interest in the property free of the trustee's authority to alienate the title upon distribution. This contention puts in issue the trustees' authority in winding up the trust upon its termination. Whether the trustees have authority to alienate a beneficiary's interest after the date set for the termination of the trust is primarily a question of the intention of the testator. Where there remain trust purposes to be served by such alienation after the date terminating the trust, it is reasonable to infer that the testator intended them to be so served.[1] Ordinarily, the legal right to trust property does not vest automatically in the person beneficially entitled to it on the termination of the trust. IV Scott on Trusts § 345, at 2739 (3d ed 1967).

It is impossible to wind up a trust of this nature on the exact date the trust ends where a division is made of other than undivided shares in the property. As we have seen, the authority of the trustees upon distribution was broad, and involved distribution in money or in kind or a combination of both. Under the circumstances of this case, there can be no real doubt that the testator intended the trustees to have the power to alienate property interests for the purposes of distribution after the date for the expiration of the trust and that title to the real property did not vest in Norman upon that date.

---

[1] For a collection of cases discussing this subject and related issues, *see* Annotation, Power of Sale Given Trustee by Will or Trust Instrument as Surviving Termination of the Trust, 43 ALR2d 1102 (1955).

The proceedings to terminate were not commenced for several months after the date Norman became 35 years of age because the trustees gave Paul and the Tullises an opportunity to arrive at a tentative division of the real property among the beneficiaries, which division would then have been submitted for the trustees' approval upon behalf of James Kevin, whose interest continues in trust until he becomes 21 years of age. Paul and the Tullises could not agree on a division, and the trustees then proceeded to act independently under their distributive powers granted in the will.

The Tullises and Gerking also contend that (1) the proceedings purportedly brought under Chapter 128 for distribution of the trust did not comply with the procedural requirements of that chapter, and the trial court, therefore, never secured *in personam* jurisdiction over the beneficiaries of the trust; and (2) the interests of the Tullises and Gerking were known to the trustees and they, the Tullises and Gerking, should have been made parties to the petition for distribution in the Chapter 128 proceedings. Assuming their contentions are correct, nevertheless, the pleadings of the Tullises and Gerking in the present proceedings put in issue the propriety of the distribution of the court's approval under the Chapter 128 proceedings. They as well as the beneficiaries had every opportunity in the present proceeding to advance, as the Tullises and Gerking did advance, all evidence and contentions they had concerning why the division of the trust assets by the trustees was improper. The trial judge resolved these contentions adversely to the Tullises and Gerking, and this court concurs. There is no reason to give them a second opportunity to litigate the identical matters which were litigated here based on the possible existence of prior procedural or jurisdictional deficiencies.

The Tullises contend it was error for the trial court not to relieve them from their contractual obligation to Gerking. It is our conclusion that this issue is not

[ 211 ]

properly presented for determination in this case. Before the Tullises may state a cause for declaratory relief against Gerking, they must allege not only that the contract exists but that Gerking is asserting or threatening to assert against them rights based upon the contract. No such allegations are to be found in the Tullises' pleading nor is there any evidence to this effect. In addition, there is no evidence whether the parties intended their agreement to be conditional upon whether or not the Tullises bought the land from Norman. The issue was ignored at trial.

After the entry of a decree in this case, the trustees, Paul Rice, and the guardian ad litem of James Kevin Rice filed cost bills including, pursuant to the provisions of ORS 128.270, a request for attorney fees. Objections to the attorney fees were filed, which objections were sustained by the trial court on the basis that an award of attorney fees under the statute was not a part of costs and that no pleadings or application for fees had been filed prior to the entry of the decree. A cross-appeal was taken from this ruling. The provisions of ORS 128.270 are:

> "Undertaking when suit instituted by party other than trustee; costs and disbursements. Any person, firm or corporation, other than the trustee, instituting proceedings under any of the provisions of ORS 128.110 to 128.270, shall contemporaneously with the filing of the proceedings, file an undertaking with one or more sureties to the effect that he will, if unsuccessful, pay all costs or disbursements that may be decreed against him therein; and if such person, firm or corporation is unsuccessful in the proceedings, the court shall tax the costs and disbursements of the proceedings, together with reasonable attorney's fees, against the unsuccessful party or parties and the surety or sureties on such undertaking."

Our prior cases have established the rule that if attorney fees are intended to be a part of costs, they only become an issue in the case when the cost bill is filed and they may then be contested as any other item of costs. *Tiano v. Elsensohn,* 268 Or 166, 170, 520 P2d

358 (1974). On the other hand, if it is not intended that attorney fees be a part of costs, an application must be made prior to judgment or decree although the trial judge may, in his discretion, delay the hearing and determination of fees until after the case has been decided on its merits. *Gorman v. Boyer,* 274 Or 467, 471-72, 547 P2d 123 (1976). It is, therefore, necessary for us to determine whether the legislature intended attorney fees to be awarded as a part of costs under the statute.

■ The statute provides that any person, other than the trustee, who institutes proceedings, must file "an undertaking * * * to the effect that he will, if unsuccessful, *pay all costs and disbursements* that may be decreed against him therein;" (Emphasis added). It further provides that "if such person * * * is unsuccessful * * * the court shall tax the costs * * * together with reasonable attorney's fees, against the unsuccessful * * * parties and the *surety or sureties on such undertaking.*" (Emphasis added.) While the language "together with reasonable attorney's fees" standing alone would not indicate that attorney's fees were intended to be a part of costs, when it becomes apparent that the sureties on the undertaking are responsible for any attorney's fees allowed and the undertaking is for "costs and disbursements" only, the conclusion is inescapable that the legislature in this instance intended that attorney fees be part of costs and disbursements. If it were otherwise, the sureties would not have been made responsible on such an undertaking for attorney fees.

It is our conclusion that the trial court erred in concluding that attorney fees are not a part of costs under ORS 128.270 and the case must be remanded for the taking of testimony upon the applications for attorney fees attributable to proceedings instituted under Chapter 128.

The decree of the trial court is affirmed in all particulars except the case is remanded for the taking

of testimony under the application of the trustees, Paul Rice, and the guardian ad litem of James Kevin Rice for attorney fees, as a part of costs, attributable to proceedings instituted under ORS ch 128.